Filed 7/27/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| FRIENDS OF THE HASTAIN TRAIL et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> COLDWATER DEVELOPMENT LLC et al., <br><br> Defendants and Appellants; <br><br> MOUNTAINS RECREATION AND CONSERVATION AUTHORITY, <br><br> Intervener and Respondent. | B249841, B251814 <br><br> (Los Angeles County Super. Ct. No. BC469573) |

APPEALS from a judgment and order of the Superior Court of Los Angeles County, Yvette M. Palazuelos, Judge. Reversed with directions.

Lewis Brisbois Bisgaard & Smith, Roy G. Weatherup, Sheldon H. Sloan, Wesley G. Beverlin and Raymond R. Barrera for Defendants and Appellants.

Overton, Lyman & Prince and Stephen L. Jones for Plaintiffs and Respondents.

Blank Rome; Finestone & Richter; Law Offices of Eric F. Edmunds, Jr., and Eric F. Edmunds, Jr., for Intervener and Respondent.

_____

Defendants Lydda Lud, LLC (Lydda Lud) and Coldwater Development LLC (Coldwater) appeal from a judgment declaring a public trail easement was established by public dedication through defendants' property for hiking, jogging, and dog-walking. Defendants contend the trial court erred in finding a public dedication of such an easement. We conclude no substantial evidence supports the court's finding that the public acquired an easement through defendants' property by implied dedication as provided for under *Gion v. City of Santa Cruz* (consolidated with *Dietz v. King*) (1970) 2 Cal.3d 29 (*Gion*). We therefore reverse the judgment and the subsequent award of attorney fees to plaintiffs.

FACTUAL AND PROCEDURAL SUMMARY

A.   The Peak Trail

In the early part of the last century, the Beverly Hills and Los Angeles fire departments constructed and maintained fire roads in the cities' wilderness areas to facilitate prevention and suppression of wildfires. In mountainous areas the fire roads were originally situated atop ridgelines, but by 1940 new roads had been constructed at lower elevations for ease of use and to mitigate erosion. The new fire roads ran near to and roughly parallel with the ridgelines, and the original roads were abandoned.

This litigation involves two parallel fire roads, an older one and its newer replacement. The older road climbed to and ran along an approximately 400-foot-long ridgeline running roughly north and south in a steep, narrow, canyon-type area of chaparral and oakwood in Los Angeles, approximately half a mile west of Coldwater Canyon Drive and a mile east of Lake Drive. By 1940, this road had been abandoned in favor of a new fire road that ran immediately to the west of the ridgeline and roughly parallel to it, but at a lesser elevation. Some hikers continued to use the abandoned road, and it came to be called the "Peak Trail" by some because it led to a high point in the terrain that afforded a 360 degree view of Los Angeles. A permanent survey marker was installed at the summit of the Peak Trail in 1952, becoming a hiking destination. The Peak Trail was situated wholly on private property.

2

## B.      The Hastain/Coldwater Trail

By 1940, the older fire road had been replaced by the Hastain Fire Road, which began at Coldwater Canyon Drive and ran south southwest for a time before meandering generally west to Lake Drive, like a backwards lazy-L.  The northeastern half of the Hastain Fire Road ran through undeveloped private property, some of it owned by defendants' predecessors, and the southwestern half ran through Franklin Canyon Park, which is public property.

The Hastain Fire Road was used by hikers, bicyclists, equestrians and dog walkers, some of whom called it the Hastain Trail and some the Coldwater Trail.  These users could access the road either from the northeast at Coldwater Canyon Drive or southwest at Lake Drive.

Before 2004, a hiker on the Hastain Trail could transition to the roughly parallel Peak Trail by climbing a moderately steep embankment.  In 2004, grading reduced this climb, making the Peak Trail more accessible.

## C.      Development Along the Trails

In the early 1990's, residential construction began where the Hastain Fire Road started at Coldwater Canyon Drive and moved southward, roughly following the road.  By the time of trial, approximately 17 private residences existed in a gated community along the road, and that portion of it taken over by the development was rededicated as Beverly Ridge Terrace, a private road.  This development also eliminated the Peak Trail north of its summit, such that by the time of trial both the Hastain Fire Road and Peak Trail were roughly half their original lengths, their northern halves having been either rededicated or eliminated.  Both now began independently at the southern border of the Beverly Ridge community, proceeded in parallel roughly southwestward, and "joined" (via an embankment) after roughly 230 feet, after which the Hastain Fire Road continued generally southwestward to Franklin Canyon Park and on to Lake Drive.

The next four lots running south from the Beverly Ridge community were purchased by Coldwater in 2011, and the two south from those were purchased by Lydda Lud in 2006.  Franklin Canyon Park begins after the southernmost of these six lots, which

remain undeveloped except for the previously mentioned 2004 grading. The Hastain Fire Road runs through these lots and through Franklin Canyon Park to Lake Drive, with a momentary emergence from the park into a noncontiguous lot owned by Lydda Lud. Mohamed Hadid, the managing member of both Coldwater and Lydda Lud, planned to build large homes on the parcels, believing this development too would result in relocation and rededication of a portion of the Hastain Fire Road. Hadid obtained the required permits and, in 2011, recommenced grading.

## D.     Litigation

Plaintiff Ellen Scott, who often used the Hastain Trail, observed the 2011 grading activity on defendants' property and organized six or seven fellow users into an association called the "Friends of the Hastain Trail," the purpose of which was to prove the trail had been dedicated to the public by operation of law as a result of its use by the public for a prescriptive period of at least five continuous years prior to March 1972.[1] Scott created a Web site and sent emails and distributed fliers seeking "legacy hikers," i.e., those who had hiked the trail prior to 1972.

In September 2011, Scott and the Friends of the Hastain Trail filed a complaint to quiet title to a public recreational trail easement through defendants' property. They alleged the Hastain Trail had been impliedly dedicated to the public as a result of 50 years of public use, including five years of open and continuous use immediately prior to March 1972. Plaintiffs sought injunctive relief preventing defendants from blocking or eliminating the trail.

In April 2012, the Mountains Recreation and Conservation Authority (the MRCA), a partnership between the Santa Monica Mountains Conservancy and two park districts, joined the litigation by filing a complaint in intervention. We will refer to Scott, the Friends of the Hastain Trail and the MRCA as "plaintiffs."

---

[1] As will be discussed, *post*, the prescriptive period runs from March 1967 to March 1972.

Defendants answered the complaints and asserted affirmative defenses, including laches, unclean hands, waiver, and the "Lack of a Basis for Injunctive Relief." According to defendants, the Hastain Trail was actually a fire road of the sort that is routinely relocated or rededicated to accommodate land development. Defendants disputed the existence of the Peak Trail entirely, and alleged the easement plaintiffs sought would render their property "undevelopable" and "utterly useless."

A court trial took place over eight days, at the outset of which the trial judge, counsel for both sides, Hadid, and two park rangers walked and drove the length of the trail from Franklin Canyon Park to the survey marker at the summit of the Peak Trail.

### 1. Plaintiffs' Evidence

#### a. The Trails

Plaintiffs showed the area surrounding the Hastain and Peak Trails is unimproved and scenic, and has long been used by hikers and others. At trial, Brian Bradshaw, plaintiffs' expert on aerial photography, testified aerial photos taken from 1960 to 1971 showed the trails to be well established. Bradshaw testified, "the main trail is the Hastain Trail which has also been referred to as a fire road." Paul Edelman, who worked for MRCA, testified MRCA patrolled and maintained the resources inside Franklin Canyon Park, which he described as "world-class." He characterized the Hastain Trail as one of the park's main trails. Although the summit (with its survey marker) was on private land (and not on the park map), Edelman believed it was a key resource because it allowed for a longer hike to a higher elevation with a good view. MRCA's rangers patrolled the trails, and MRCA felt obligated to protect the summit, which hikers had long visited. Edelman had been on all parts of the trails at various times, including in the fall of 1972, and remembered yellow posts at the Hastain Trail trailhead connected by a chain or cable to keep cars out. He thought the barrier had been installed by the fire department and indicated the trail was a public fire road. In 2011, he became aware that Hadid had fenced off the trail.

### b. Hastain Trail Legacy Hikers

Plaintiffs identified the prescriptive time frame as March 1967 to March 1972, during which the Hastain Trail was used by seven legacy hikers who testified at trial: James Goller, Larry Harrow, Joan Carl, Frederic Harris, Carole Hemingway, Cynthia Foran, and Richard Saul.[2]

Goller testified he hiked the Hastain Trail on Sundays approximately 40 times per year from 1967 (and prior), when he was 10 years old, to 1972 (and beyond), at first with his father, then six times with his 12-member cub scout den, and later, as a teenager, with friends.

Harrow hiked the trail from approximately 1963 to recently. During the prescriptive period, he hiked the trail approximately every other weekend in 1967 and 1968, and from 1970 to 1972, sometimes with friends and sometimes by himself.

Carl, a sculptor, testified she hiked the trail with her dog in the mornings or late afternoons from October to April beginning in 1968. She would start from Coldwater Canyon Drive and hike southward, usually turning around after passing the peak, using the trail "[s]ometimes twice a week, sometimes twice a month. Sometimes maybe not at all." She eschewed hiking from May to September to avoid heat and rattlesnakes. Carl believed the trail was public property because it was "totally open," with a garbage can for dog waste. Until shortly before trial she thought it was called the "Coldwater Trail."

Harris and Hemingway hiked the trail together four or five times a week in the late afternoon or early evening during the summers of 1970 and 1971, plus an occasional Thanksgiving or Christmas holiday during those years.[3] Harris would park his car at the trailhead on Lake Drive (west of defendants' property) and hike a circuit of the trail in

---

[2] An eighth legacy hiker, Keith Lehrer, testified he used the Hastain Trail with his friend and the friend's father about 15 times in 1965, which the trial court found to be before the relevant time period. He sometimes went to the peak. He always saw four to six other people on the trail.

[3] Harris and Hemingway also hiked the trail in the summer of 1972, which is after the relevant time period.

two different directions. He testified the Hastain Trail "dumped out" on Coldwater Canyon Drive (north and east of defendants' property). An average hike lasted from one to two hours.

Foran hiked the trail six or seven times in 1971, when she was 11 years old, half the time with an older brother and the other half with some friends.

Saul hiked the trail once in 1971, alone.

The legacy hikers saw others on the Hastain Trail. Goller testified he saw 8 to 20 people over the course of each of his hikes. Harrow saw between 2 and 12 people on the trail every time he was on it. Carl occasionally saw others in one's and two's, sometimes in groups of 2 to 4, including equestrians and dog walkers. Harris and Hemingway always saw 6 to 12 cars parked at the trailhead on Lake Drive, and between 6 and 20 people on the trail during their hikes. Foran would see 1 or 2 other hikers during each of her 7 hikes. Saul saw no one else during his one time on the trail.

Plaintiffs estimated the trail took about two hours to hike. Assuming a hiking day is six hours long (because most people don't hike in the midday sun), plaintiffs calculated that approximately 12 people used the trail per day, which amounted to approximately 4,000 per year.

### c. Peak Trail Legacy Hikers

Only Goller, Harris, Hemingway and Foran testified they used the Peak Trail during the relevant time period. Goller used it approximately forty Sundays a year from 1967 to 1972 (and before and after that time), Harris and Hemingway used the trail once or twice a week in the summers of 1970 and 1971, and Foran used it seven times in 1971.

Goller testified the Peak Trail was "really steep," "very narrow," "arduous," and a "challenge." Harris testified the trail was "pretty treacherous," and Hemingway said it was "steep, had "cliffs on both sides," and Harris had to "push" her to climb it. Foran testified the Peak Trail could not be reached on a minibike because the embankment between it and the Hastain Trail was too steep.

No one testified to seeing anyone else specifically on the Peak Trail. Harris testified he saw people "all over the trail," which could mean both the Hastain and Peak

7

Trails, but the context indicates he meant the "trail" from Lake Drive to Coldwater Canyon, which is the Hastain Trail. He testified about the Peak Trail separately, and never said he saw anyone on it.

Only Harris testified to using either of the trails on any weekday, always accompanied by Hemingway.

### d. Extrapolated Usage

Because the legacy hikers testified they almost always saw others on the Hastain Trail, from two to possibly a dozen or more each time, the trial court inferred many more must also have used both the Hastain and Peak Trails. "The average was about three to four other hikers," the court found, which "[w]hen extrapolated over the hours of the day and days of the year [amounted] to thousands of hikers over the relevant period."

### 2. Defendants' Evidence

For the defense, Robert Pope, an expert on aerial photography, testified he had examined three-dimensional photographs depicting the Hastain Fire Road and its surrounding area beginning in the mid-1920's, but found no definitive evidence the Peak Trail ever existed. He did not dispute, however, that a variety of people could have hiked to the peak between 1967 and 1972. Frank Haselton, a viewshed analysis expert, testified the Hastain Trail was visible from some public vantage points but not from others. Ken Shank, a surveying and grading expert who had prepared defendants' building plans, testified homes could not be constructed on defendants' lots if the requested public easement was established, but it might be possible to reroute the Hastain Trail to make room for the construction. He testified defendants' building plans called for relocation of the Hastain Fire Road.

Hadid testified he had been a global real estate developer for 40 years. He first visited the subject property in 2001 or 2002 and was aware that a fire road passed through it but believed it could be relocated and rededicated. Before buying the property, Hadid inspected the land and performed a title check to discover if any easement or right-of-way existed, finding none. If there had been an easement or restriction he would not have purchased the property.

8

### 3. Statement of Decision and Judgment

In October 2012, the trial court issued a tentative decision and judgment in favor of plaintiffs. Plaintiffs thereafter filed a proposed statement of decision, to which defendants objected on the grounds, among others, that it failed to address: (1) "whether the court made an equitable balancing of the hardship on the Property Owners that would be imposed by granting the proposed implied easement on Defendants' property"; and (2) "whether the court is required to or even attempted to fashion the proposed easement as narrowly as possible to avoid prejudice to the [Defendants] with regards to the scope and location of the proposed easement on Defendants' property relative to the Property Owner's ability to develop his property as planned and to evaluate any hardship and/or balancing hardships between the parties." In support of the objections, Shank, the surveying and grading expert, proposed that an alternative easement be created, one that allowed for residential development of the area while preserving the public's hiking experience.

On April 17, 2013, the court overruled most of defendants' objections and filed its judgment and amended statement of decision.

The judgment created an easement designated as the Hastain Trail but which we will call the "Judgment Trail" to distinguish it from the historical Hastain Trail. The Judgment Trail is set out in three segments. The first, tracking the Peak Trail, begins at the summit and proceeds southwestward for 233.72 feet, where it meets the Hastain Fire Road, and thence atop the fire road for 620.86 feet to the border between Coldwater Canyon's and Lydda Lud's parcels. The easement is described in metes and bounds, as follows: "COMMENCING AT THE NORTHWEST CORNER OF [LOT 1; defendants' northernmost parcel], THENCE ALONG THE NORTHERLY LINE OF LOT 1, SOUTH 88°22'30 EAST, 674.66 FEET TO THE POINT OF BEGINNING, SAID POINT BEING THE CENTERLINE OF A 5.00 FOOT WIDE TRAIL, KNOWN AS THE HASTAIN TRAIL, THENCE ALONG THE HASTAIN TRAIL BEING 5.00 FEET WIDE AND LYING 2.50 FEET ON EACH SIDE OF THE FOLLOWING DESCRIBED CENTERLINE THE FOLLOWING COURSES:

9

"1ST    SOUTH 0.4°53'25" WEST, 16.24 FEET THENCE;

"2ND    SOUTH 0.3°15'56" EAST, 19.22 FEET THENCE;

"3RD    SOUTH 16°29'43" WEST, 71.72 FEET THENCE;

"4TH    SOUTH 20°21'13" WEST, 71.72 FEET THENCE;

"5TH    SOUTH 11°45'02" WEST, 54.82 FEET TO A POINT, SAID POINT

HEREINAFTER REFERRED TO AS POINT 'A'.  SAID POINT BEING THE

TERMINATION OF THE 5.00 FOOT WIDE TRAIL AND THE BEGINNING OF THE

15.00 FOOT WIDE TRAIL;

"THENCE, CONTINUING ALONG HASTAIN TRAIL BEING 15.00 FEET

WIDE AND LYING 7.50 FEET ON EACH SIDE OF THE FOLLOWING DESCRIBED

CENTERLINE THE FOLLOWING COURSES:

"6TH    SOUTH 1.5°46'35" WEST, 138.25 FEET THENCE;

"7TH    SOUTH 31°07'10" EAST, 99.68 FEET THENCE;

"8TH    SOUTH 38°04'10" WEST, 98.16 FEET THENCE;

"9TH    SOUTH 46°45'46" WEST, 92.28 FEET THENCE;

"10TH SOUTH 49°09'09" WEST, 15.98 FEET THENCE;

"11TH SOUTH 18°57'00" WEST, 15.45 FEET THENCE;

"12TH SOUTH 08°44'01" EAST, 59.10 FEET THENCE;

"13TH SOUTH 03°49'45" EAST, 95.96 FEET THENCE."

The second segment begins at the border between Franklin Park and Lydda Lud's southernmost parcel and proceeds 740.79 feet northeastward until it meets up with the first segment.  This segment is described in metes and bounds also, for example as follows:

"COMMENCING AT THE NORTHWEST CORNER OF [LYDDA LUD'S LOT 6], THENCE SOUTH 00°16'16" WEST, A DISTANCE OF 278.89 FEET TO THE TRUE POINT OF BEGINNING;

10

"THENCE . . . ALONG SAID HASTAIN TRAIL BEING 15.00 FEET WIDE AND LYING 7.50 FEET ON EACH SIDE OF THE FOLLOWING DESCRIBED CENTERLINE THE FOLLOWING COURSES:

"1ST  SOUTH 70°00'33" EAST, 13.62 FEET THENCE;

"2ND  NORTH 82°49'32" EAST, 40.82 FEET THENCE; [¶] . . . [¶]

"11TH  NORTH 40°19'01" EAST, 62.00 FEET TO A POINT THAT IS DISTANT SOUTH 79°51'34" EAST, 383.30 FEET FROM THE NORTHWEST CORNER OF [LYDDA LUD'S LOT 5]."

The third segment of the easement describes, also in metes and bounds, a 158.68 inverted "U" where a portion of the Hastain Fire Road departs from Franklin Park into Lydda Lud's property but quickly returns to the park.

The judgment is silent as to that portion of the Hastain Trail running north from the junction with the Peak Trail to the Beverly Ridge community. The judgment is also silent as to those portions of the Hastain and Peak Trails that were either rededicated in or eliminated by the Beverly Ridge development.

In its statement of decision, the trial court found the Judgment Trail was "an old fire road leading from Lake Drive up the hill until very near the peak. At that point, the Trail veers east from the fire road up to the peak." The "general public knew of and used the trail for five continuous years prior to March 4, 1972." The public's use was "substantial," i.e., by more than a limited and definable number of persons. The court found "the public used the trail without objection and as if it were a public trail," and no user was told he or she was on private property or warned not to hike the trail, and no fences or signs impeded hiking. The public use was open and obvious, and the then owners had either actual or constructive notice of it. Further, most of the hikers testified they saw other hikers throughout the length of the trail, from two to a dozen or more, and "a substantial number of the other hikers were hiking to the peak" during the relevant period. The court found that photographs and testimony demonstrated the public used the Hastain Fire Road to get to the Peak Trail, and used the Peak Trail to get to the summit.

11

In 2011, grading had slightly modified the junction of the two trails, but the court found this modification too insubstantial to affect the easement. In sum, the court found defendants' predecessors had impliedly dedicated an easement for "public recreational uses of hiking, jogging, and dog-walking." The easement is 5 feet wide on the Peak Trail portion and 15 feet wide on the Hastain Trail portion.

The judgment provides that defendants "hold no legal or equitable right, title, estate, lien or interest in and to the Trail" and have no obligation to maintain it, and enjoins defendants from interfering with public recreational uses and reasonable maintenance of the trail and orders them to remove from it all items they own or control.

Regarding defendants' objections, the court stated defendants' inability to develop the property was "irrelevant. When Defendants acquired the property, they took subject to whatever easements and encumbrances had been created by prior owners." In response to the argument that the court should fashion the easement so as to avoid prejudice to defendants' right to develop the property, the court stated that it "fashioned nothing. The easement is as described in the surveys attached to the pleadings and stipulated at trial." The court also refused to "'balance the equities' . . . because Defendants' claim of hardship and balancing the equities is not an element of an implied dedication at law for public recreational purposes." Moreover, the court stated, there was no "hardship" to defendants because they "acquired their property interests decades after the public had already [become] vested in its right to use the Trail." Finally, the court stated that defendants "are simply not in an equitable position," because "the due diligence [Hadid] performed on the property was inadequate and insufficient." Hadid, the court explained, ignored evidence of the public's use of the trail, and the testimony of his belief that all claims must be recorded was not credible.

### 4. Post-trial Motions

In motions for new trial and to vacate the judgment, defendants renewed their arguments that the court should consider the hardship to them and "balance the equities in determining the scope or location of the [easement]." Defendants' proposed an "Alternative Trail Easement" that they represented provided "panoramic views that are

12

far superior to the view available at the top of the 'Peak Trail' portion of the [easement defined in the judgment] which has an impaired view looking north due to a fence built by the owner of the property to the north and his placement of tall trees along the fence line." The Alternative Trail Easement would also connect to other trails managed by MRCA, and be safer and longer than the "Judgment Trail." Hadid represented he would grade the Alternative Trail Easement and add a viewing deck and other related improvements for the benefit of the hiking public so as to make the Alternative Trail Easement a better hiking experience than that afforded by the Judgment Trail. Hadid stated he offered the plans so the court under its equitable powers could "consider and balance the equities of an alternative location for placement of the public trail for hiking purposes and for entry of a new judgment."

In their opposition to defendants' motion to vacate the judgment, plaintiffs argued the court had previously addressed and rejected defendants' arguments. They did not, however, dispute Hadid's presentation about the benefits of the proposed Alternative Trail Easement.

In denying the motions for new trial and to vacate the judgment, the court rejected defendants' arguments by referencing its statement of decision.

Defendants filed a timely appeal. The trial court thereafter granted Scott's and Friends of the Hastain Trail's motion for attorney fees, awarding $330,696.60. Defendants filed a timely appeal from the fee award as well. We consolidated the two appeals. After oral argument, we requested further briefing on issues discussed in this opinion, which both sides provided. Defendants submitted along with their letter brief requests for judicial notice of a title report, a 1936 deed, certain portions of the 2013 California Fire Code, a document published by the Los Angeles Fire Department, a publication issued by the United States Government, and portions of the Los Angeles Municipal Code. Defendants' requests for judicial notice are denied because the documents are either irrelevant, lack foundation, or attempt to introduce new evidence.

13

**DISCUSSION**

Defendants argue:  The trial court applied the wrong law; the judgment is unsupported by substantial evidence; the Judgment Trail is not the same as was used by the public during the prescriptive period; the trial court should have relocated the trail to serve equity; and the judgment improperly granted the public a fee interest in the easement.

## I.     The Trial Court Properly Applied *Gion*.

Defendants argue the doctrine of implied dedication set forth in *Gion* applies only to beachfront or shoreline property and roads, not to inland wilderness property or recreational hiking trails.  We disagree.

A "dedication" is an uncompensated transfer of an interest in private property to the public, and "may occur pursuant to statute or the common law."  (*Friends of the Trails v. Blasius* (2000) 78 Cal.App.4th 810, 820 (*Blasius*).)  "'Dedication has been defined as an appropriation of land for some public use, made by the fee owner, and accepted by the public.  By virtue of this offer which the fee owner has made, he is precluded from reasserting an exclusive right over the land now used for public purposes.  American courts have freely applied this common law doctrine, not only to streets, parks, squares, and commons, but to other places subject to public use.  California has been no exception to the general approach of wide application of the doctrine.'"  (*Id.* at p. 820.)

"Express dedication arises where the owner's intent to dedicate is manifested in the overt acts of the owner, e.g., by execution of a deed.  An implied dedication arises when the evidence supports an attribution of intent to dedicate without the presence of such acts," such as "when the public use is *adverse* and exceeds the period for prescription."  (*Blasius*, *supra*, 78 Cal.App.4th at p. 821; see *Union Transp. Co. v. Sacramento County* (1954) 42 Cal.2d 235, 243, abrogated in part on other grounds by Sts. & Hy. Code, §§ 941, 1806 [intent on the part of the owner to dedicate land to the public may be shown expressly or by implication].)  An owner's offer to dedicate can thus be inferred from factual circumstances in the same general manner as prescriptive rights are established, i.e., circumstances that show "the public has used the land 'for a period of

14

more than five years with full knowledge of the owner, without asking or receiving permission to do so and without objection being made by anyone.' [Citation.] . . . [T]he question is whether the public has engaged in 'long-continued adverse use' of the land sufficient to raise the 'conclusive and undisputable presumption of knowledge and acquiescence, while at the same time it negatives the idea of a mere license.'" (*Gion*, *supra*, 2 Cal.3d at p. 38.)

"What must be shown is that persons used the property believing the public had a right to such use." (*Gion*, *supra*, 2 Cal.3d at p. 39.) A litigant claiming implied dedication must establish "that persons have used the land as they would have used public land," in the case of a beach or shoreline, "as if it were a public recreation area," and if "a road is involved, the litigants must show that it was used as if it were a public road." (*Ibid.*; *Bess v. County of Humboldt* (1992) 3 Cal.App.4th 1544, 1550, 1551.) The evidence must also demonstrate that "various groups of persons," not a "limited and definable number of persons," have used the land "'when they wished to do so without asking permission and without protest from the land owners.'" (*Gion*, *supra*, at p. 39.) The "'issue is ordinarily one of fact, giving consideration to all the circumstances and the inferences that may be drawn therefrom. The use may be such that the trier of fact is justified in inferring an adverse claim and user and imputing constructive knowledge thereof to the owner.'" (*Id*. at pp. 40-41, quoting *O'Banion v. Borba* (1948) 32 Cal.2d 145, 148-149.) Each inquiry depends on "'the facts and circumstances attending the use.'" (*County of Los Angeles v. Berk* (1980) 26 Cal.3d 201, 214 (*Berk*), citation omitted; *Mulch v. Nagle* (1921) 51 Cal.App. 559, 567 ["Whether a particular strip of land has been dedicated or abandoned to the public for highway purposes depends upon the circumstances of each case"].)

An owner may avoid dedication by affirmatively proving the public was granted a license to use the property. (*Gion*, *supra*, 2 Cal.3d at p. 41.) Even if the present fee owners make it clear that they do not approve of the public use of the property, "[p]revious owners . . . by ignoring the wide-spread public use of the land for more than five years [may] have impliedly dedicated the property to the public." (*Id.* at p. 44.) For

example, in *Gion*, our Supreme Court concluded that an implied dedication of private land (three parcels of land on a shoreline, and a beach and the road leading to it) for public use occurred when the public had made use of the land for more than five years without objection by the owners. (*Ibid*.)

The *Gion* decision resulted in "soaring sales of chain link fences," a "spate" of critical legal commentary, and the Legislature's enactment of Civil Code section 1009. (*County of Orange v. Chandler-Sherman Corp.* (1976) 54 Cal.App.3d 561, 564; 12 Witkin, Summary of Cal. Law (10th ed. 2005) Real Property, § 249, p. 303.) The statute, enacted on March 4, 1972, provides that "no use of [private real property] by the public after the effective date of this section shall ever ripen to confer upon the public . . . a vested right to continue to make such use permanently" without an express dedication by the owner. (Civ. Code, § 1009, subd. (b); see *Blasius*, *supra*, 78 Cal.App.4th at p. 823.) Civil Code section 1009 abrogated the *Gion* decision, but only prospectively, affecting no rights that had vested prior to its enactment. (*Blasius*, at p. 823.)

Defendants argue *Gion* does not apply here because their property consists of inland wildlands, not beachfront or shoreline property or a road. In *Gion*, however, the court explained no different rules exist for roadways or other areas, noting that prior cases had found implied dedication in parkland, beaches and athletic fields. (*Id.* at pp. 41-42.)

Defendants argue we should follow *Richmond Ramblers Motorcycle Club v. Western Title Guaranty Co.* (1975) 47 Cal.App.3d 747, in which the majority stated in dicta that the rules and rationale of *Gion* apply only to roads, beaches, and shoreline areas, not remote wilderness areas. (*Id*. at pp. 754, 758-759.) But the Supreme Court later disavowed such a limitation in *Berk* reiterating *Gion*'s holding that the doctrine of implied public dedication is not limited to any specific kind of real property. (*Berk*, *supra*, 26 Cal.3d at pp. 214-215; see *Burch v. Gombos* (2000) 82 Cal.App.4th 352, 355, 356-358 [upholding a finding of implied public dedication of a one-lane dirt road in the Santa Cruz Mountains]; *Blasius*, *supra*, 78 Cal.App.4th at pp. 822, 824 ["there is no difference between dedication of shoreline property and other property"; "Well within the

16

ancient reach of the common law of dedication is the establishment of a public footway"]; *County of Orange v. Chandler-Sherman Corp.*, *supra*, 54 Cal.App.3d at p. 564 [*Gion* applies to noncoastal property "such as roads, passageways and paths"].)

We conclude the trial court correctly applied *Gion* to plaintiffs' implied dedication claim. Although it "may require more circumstances to establish" dedication in the case of uncultivated and unenclosed land, "the test is ultimately the same." (*O'Banion v. Borba*, *supra*, 32 Cal.2d at p. 150; see *Union Transp. Co. v. Sacramento County*, *supra*, 42 Cal.2d at pp. 240-241 ["Whether the user was adverse is a question of fact to be determined from all of the circumstances of a case"]; *Hays v. Vanek* (1989) 217 Cal.App.3d 271, 282 ["Whether an owner has made an offer is a question of fact requiring an examination of all the pertinent circumstances"].)

## II. No Substantial Evidence Supports The Implied Dedication Of A Public Trail Easement.

Having concluded the trial court applied the proper legal test, we must determine whether substantial evidence supports the finding of an implied-in-law dedication. In doing so, we accept as true all evidence tending to establish the correctness of the trial court's findings, take into account all reasonable inferences that could lead to the same conclusion, and resolve every substantial conflict in the evidence in favor of the findings. (*Ermoian v. Desert Hospital* (2007) 152 Cal.App.4th 475, 501.)

There is little if any evidence in the record about who owned the subject property during the prescriptive period or whether the owners actually knew hikers were using their land. The issue is therefore whether, under all the circumstances, public use of the subject property between 1967 and 1972 sufficed to put defendants' predecessors on constructive notice that their property was in danger of public dedication. Plaintiffs must show the public "used the land as they would have used public land," and in the case of a road, "as if it were a public road." (*Gion*, *supra*, 2 Cal.3d at p. 39.)

17

### A. Use of a Fire Road Easement does not Constitute Use of, or Grant Prescriptive Rights to, the Servient Tenement

Use sufficient for implied public dedication must "clearly indicate to the owner that his property is in danger of being dedicated." (*County of Orange v. Chandler-Sherman Corporation*, *supra*, 54 Cal.App.3d at p. 565.) No public use of the Hastain Fire Road could have put defendants' predecessors on actual or constructive notice that *their property* was in danger of public dedication because the fire road was not their property, it was a public easement *on* their property, and once granted, the scope of a public easement cannot be materially changed without notice. (Civ. Code, § 806 ["The extent of a servitude is determined by the terms of the grant, or the nature of the enjoyment by which it was acquired"].)

The Public Resources Code instructs the State Board of Forestry and Fire Protection to adopt regulations implementing minimum fire safety standards applicable to lands for which the state bears responsibility, including regulations pertaining to fire roads. (Pub. Resources Code, §§ 4002, 4290.) The purpose of a fire road is to "provide for safe access for emergency wildland fire equipment and civilian evacuation concurrently, and . . . provide unobstructed traffic circulation during a wildfire emergency." (Cal. Code Regs., tit. 14, § 1273.00.) The Los Angeles Municipal Code (LAMC) authorizes the Los Angeles Fire Chief to enforce fire regulations adopted by the state. (LAMC, § 57.103.1.4.) For example, LAMC section 57.4908.3 authorizes the fire chief "to construct fire roads and firebreaks in or upon any undeveloped lands in any mountain or hill area, whether or not such lands are public or private, with the consent of the owner thereof, and to maintain the same on a permanent basis when the Chief determines that such fire roads and firebreak are necessary for the protection of life and property against fire or panic." Where such fire roads exist, they are "*granted to the City without cost as easements* from a public street or alley to the required terminal point." (LAMC, § 57.503.1.6, italics added.) The fire department has the right to pass over fire roads by easement, license, city ownership, "or otherwise." (LAMC, § 57.4908.3.1.) The right of an agency to use a fire road is a "reserved easement." (*Walsh v. Macaire*

18

(1951) 102 Cal.App.2d 435, 436.)  A fire road may also become a public easement by the implied dedication process.  (See, e.g., *Brumbaugh v. County of Imperial* (1982) 134 Cal.App.3d 556, 563.)

A wilderness fire road is thus a conditional, temporary public easement, existing only for so long as and to the extent needed to help protect against fire.  (See *Jones v. Deeter* (1984) 152 Cal.App.3d 798, 802 ["A dedication is legally equivalent to the granting of an easement"; *Walsh v. Macaire*, *supra*, 102 Cal.App.2d at p. 436.)  When land burdened by a fire road easement is developed, the road is replaced with an approved fire apparatus access road extending to within 150 feet of all portions of the exterior walls of the first story of every building.  (See LAMC § 57.503, adopting the Intl. Fire Code, § 503.1.1; see also Cal. Fire Code, tit. 24, § 503.1.1.)  These access roads are commonly public and private streets.

An easement is an interest in the land of another that entitles the owner of the easement to limited use or enjoyment of the servient tenement.  (*City of Long Beach v. Daugherty* (1977) 75 Cal.App.3d 972, 977.)  The circumstances existing at the time of and giving rise to the conveyance determine the nature and extent of the easement.  (Civ. Code, § 806; *Southern Pacific Co. v. San Francisco* (1964) 62 Cal.2d 50, 54; *Burch v. Gombos*, *supra*, 82 Cal.App.4th at p. 362.)  The use may change or increase, but only so long as the change does not materially increase the burden on the servient tenement.  (*Rye v. Tahoe Truckee Sierra Disposal Co., Inc*. (2013) 222 Cal.App.4th 84, 92.)  Any permissible change would be limited "to such uses as the facts and circumstances show were within the reasonable contemplation of the parties at the time of the conveyance." (*Fristoe v. Drapeau* (1950) 35 Cal.2d 5, 10; see *Camp Meeker Water System, Inc. v. Public Utilities Com*. (1990) 51 Cal.3d 845, 866-867.)

Here, it was undisputed the Hastain Trail ran atop the Hastain Fire Road.  Maps from the 1920's to the present showed and labeled the fire road, lawyers from both sides described it as a fire road during the site visit, experts from both sides stated the trail ran atop the fire road, several hikers identified it as a "road," and the judgment itself refers to it as a fire road and states the "Fire Road is that portion of the survey, attached as

19

Exhibits A and B, of the Trail which is 15 feet wide," which includes all of the Hastain Trail.

At the time the Hastain Fire Road was created the property owners and public could reasonably contemplate it would be used by hikers and, as such would not materially increase the burden on the servient tenement. "Road easements can be used for all reasonable purposes." (6 Miller & Starr, Cal. Real Estate (4th ed. 2015) § 15:59, p. 15-212.) But the parties could not reasonably contemplate the hikers' use would become permanent, because transforming a temporary, mutable easement into one that is permanent and immovable would substantially increase the burden on the servient tenement by restricting its future development. In "ascertaining whether a particular use is permissible under an easement created by prescription, the needs which result from a normal evolution in the use of the dominant tenement and the extent to which the satisfaction of those needs increases the burden on the servient tenement must be considered. The increase must be a normal development, reasonably foretold, and consistent with the pattern formed by the adverse use by which the prescriptive easement was created." (*Applegate v. Ota* (1983) 146 Cal.App.3d 702, 711.) Permissible use by the public of an easement the public already owns would not foretell a drastically expanded use, inconsistent with the pattern under which the easement was created, much less that the servient tenement would itself be in danger of permanent, unconditional public dedication, as occurred here.

The trial court implicitly recognized these principles, finding that "[w]hen Defendants acquired the property, they took subject to whatever easements and encumbrances had been created by prior owners. . . . "[T]he public easement must be respected." But the court failed to recognize that the same was true as to the public itself, which likewise took the fire road subject to the preexisting easement.

"If a landowner's intent to dedicate property to public use is to be implied, that purpose must clearly appear from the surrounding circumstances. [Citations.] The rationale underlying the strict requirements which must be satisfied to establish a dedication is to avoid potential detriment to persons who, through inattention to legal

20

detail or motivated by decency permit others to use their land." (*Hays v. Vanek*, *supra*, 217 Cal.App.3d at pp. 281-282.) The "idea of a dedication to the public of a use of land for a public road, must rest on the clear assent of the owner, in some way, to such dedication." (*Harding & Loftin v. Jasper* (1860) 14 Cal. 642, 649.) The "bare fact that a farmer opens a lane through his farm, and allows the public to use it for fifteen years, does not authorize the inference of a dedication to the public. The intent to dedicate must be obvious. . . . 'Persons who have, from mere kindness, suffered others to enjoy privileges in their lands, have been eventually coerced into parting with them entirely, without compensation, and to yield up as rights what they had previously suffered or allowed as favors, and the simple expression of an intention, has often been distorted into a positive promise, and occasionally to those who have no distinct interest in its performance. Our title to our lands is too important to be lightly lost, upon slight presumptions. Before the owner should be deprived of his property, his intention to part with it should be clearly and unequivocally expressed.'" (*Id.* at pp. 648-649, citation omitted.)

The trial court erred in establishing a permanent and fixed public easement that drastically expanded on the existing temporary and mutable public easement. The judgment gave the public rights not only to use the fire road for so long as its existence was necessary for fire protection, but also to burden the underlying fee estate in perpetuity, as set forth in the metes and bounds description of the new easement. Those rights were neither conditional nor temporary, as was the fire road easement itself, but unlimited and permanent. But "'[n]othing can be clearer than that if the grant is made for a specified, limited and defined purpose, the subject of the grant cannot be used for another, and the grantor retains still such an interest therein as entitles him, in a court of equity, to insist upon the execution of the trust as originally declared and accepted.'" (*Marshall v. Standard Oil Co.* (1936) 17 Cal.App.2d 19, 27.) It is a "'universally accepted rule of law that land which has been dedicated for a definite and specific purpose must be used in conformity with the terms of the dedication, and not diverted to any other purpose or use.'" (*Ibid.*; *Roberts v. Palos Verdes Estates* (1949) 93 Cal.App.2d

21

545, 547 ["where a grant deed is for a specified, limited and definite purpose, the subject of the grant cannot be used for another and different purpose"].)

*Blasius*, upon which plaintiffs chiefly rely and the facts of which are somewhat analogous to those here, is not to the contrary. There, the public had for many years used a canal road alongside the Rattlesnake Canal—which together (road and canal) comprised an easement owned by the Nevada Irrigation District over property owned by private landowners—for walking, jogging, riding bicycles or horses, and fishing, as well as a means to get from one place to another. Based on this use, the trial court recognized the landowners had impliedly dedicated to the public an easement consisting of "the width of the Rattlesnake Canal plus its westerly berm, which is nine feet wide, more or less." (*Blasius*, *supra*, 78 Cal.App.4th at p. 819.) The appellate court affirmed the finding. In dicta the court also stated that "a long history of continued passage by a diverse group of occasional hikers across a well defined privately owned trail segment leading to a network of trails, say on a public wilderness area, might suffice" for implied public dedication. (*Id.* at p. 825, fn. 7.)

The instant facts are distinguishable from those both existing and hypothesized in *Blasius*. There, the trial court identified a dedicated trail easement in relation to the preexisting public easement it overlapped, the Rattlesnake Canal, not, as here, in a metes-and-bounds legal description of the subservient tenement. As such, the overlapping easement in *Blasius* was bound to the underlying easement, and if the latter were to change course or disappear altogether, the former would follow. Here, as plaintiffs admitted in their letter brief, the Judgment Trail is independent of and would survive relocation or removal of the Hastain Fire Road. It may well be, as the *Blasius* court stated in dictum, that continued passage by a diverse group of occasional hikers across a well defined privately owned trail segment will suffice for public dedication *of the trail segment*, but passage across a contingent and temporary road does not suffice for permanent dedication of the privately owned *subservient tenement*.

Plaintiffs argue no evidence was adduced at trial that the fire department had an actual easement, license, or any right at all to use the Hastain Fire Road.

To the contrary, the only reasonable inference from maps admitted at trial, multiple witness statements, plaintiffs' repeated admissions, and the judgment itself—all indicating the Hastain Trail was indeed a fire road—was that the fire department at least had a right to use it, if not an easement or license. In any event the point is irrelevant, as we do not hold that a preexisting fire road—whether an easement or not—cannot be publicly dedicated so long as the dedication is limited to the *fire road*. But here, the trial court found the servient tenement, not the fire road, was dedicated to the public. As we discussed, nothing about public use of a fire road as a hiking trail would put a reasonable owner on notice that the servient tenement was in danger of dedication.

Plaintiffs have identified no authority from any jurisdiction holding that use of a fire road (or anything similar) by a private party or the public may result in either a prescriptive easement or public dedication burdening the servient tenement and outlasting the road itself, and we have discovered none.[4] Some of the cases hold an owner cannot restrict use of a dedicated road running over his property, but none holds the owner cannot remove the road altogether. In the case of a fire road, an owner can remove it when it is no longer needed for fire protection. Under these circumstances, no reasonable owner could anticipate that a fire road running over his or her property might become a permanent hiking trail.

_____

[4] *Burch v. Gombos,* upon which the dissent relies, is not dispositive. There, property owners sued a logging company to enjoin use of a fire road running across their property for transporting logs. (*Burch v. Gombos*, *supra*, 82 Cal.App.4th at p. 355.) The trial court found the road had been impliedly dedicated to the public as a result of longtime public recreational use, and further found the owners could not restrict the logging company's use of what now amounted to a public road. (*Id*. at p. 363.) Although the appellate court affirmed these findings, the property owners on appeal made "no real argument" regarding the prior public dedication, but argued only that the evidence did not support expansion of the dedication to logging purposes. (*Id*. at p. 362, fn. 14.) The court therefore had no occasion to discuss whether public recreational use of a fire road suffices to convey notice to the owner that even the road is in danger of public dedication, much less, as here, that the subservient tenement is. A case is no authority for a proposition not discussed. (*People v. Barragan* (2004) 32 Cal.4th 236, 243.)

23

The judgment here grants permanent rights to the servient tenement, land burdened by a preexisting, conditional, temporary public easement, notwithstanding temporal limitations on the easement itself. No such rights could have ripened by way of public dedication no matter how extensive the public use of the Hastain Fire Road because the owner could not have known more than the temporary road itself was at risk.

## B. No Substantial Use of the Peak Trail

The same cannot be said of the Peak Trail, because the fire road beneath it had been abandoned by the 1940's, and any public rights to it were therefore extinguished long before the prescriptive period. (Civ. Code, § 811(4) [a servitude is extinguished by disuse].) But under even the most generous view of the evidence, public use of the Peak Trail was miniscule.

Under *Gion*, a plaintiff asserting implied public dedication must present evidence that "the public has engaged in 'long continued adverse use' that "negatives the idea of mere license" or neighborly accommodation. (*Gion*, *supra*, 2 Cal.3d at p. 38; *Blasius*, *supra*, 78 Cal.App.4th at p. 825 [the question is "whether the use in issue should be characterized as prescriptive or attributed to neighborly accommodation"]; *Aptos Seascape Corp. v. County of Santa Cruz* (1982) 138 Cal.App.3d 484, 501.)[5] To counter the idea of license a plaintiff must show open, substantial use of private property. (*Gion*,

_____

[5] The "idea of license" is the idea that owners of wildlands might permit occasional hikers to enter their property with no thought on either side that sparse, harmless use will ripen into prescriptive rights or public dedication. (See *Boyden v. Achenbach* (1878) 79 N.C. 539, 541 [footpaths "are understood to be used by leave, and they are closed when the owners of the lands desire to put them under cultivation or to enclose them"]; *Behrens v. Richards* (1905) 2 Ch. (Eng.) 614 ["In permitting persons to stray along the cliff edge or wander down the cliff face or stroll along the foreshore the owner of the land was permitting that which was no injury to him, and whose refusal would have been a churlish and unreasonable act on his part. From such user nothing . . . is to be inferred"]; *Schwinge v. Dowell* (1862) 175 Eng.Rep. 1314 [permission to travel at will in an ancient forest does not show a right to the footpath]; United Kingdom Countryside Code ["Leave gates and property as you find them and follow paths unless wider access is available"].) This is not a presumption, but a burden of proof. (See *Berk*, *supra*, 26 Cal.3d at p. 215 [cases are "to be decided not from the standpoint of presumptions but from that of 'the sufficiency of the evidence'"].)

at p. 39.) In *Gion*, which found a public dedication, members of the public had for decades "made continuous and uninterrupted use" of beachfront property "in substantial numbers," with full knowledge of the owners, for fishing, swimming, picnicking, and viewing the ocean. (*Id*. at pp. 34, 35, 36.)

Here, the trial court's finding that "[s]everal of the legacy hikers hiked the Trail during each of the years from 1962 to 1972" is unsupported in the record. The only legacy hiker to have used either the Hastain or Peak Trail every pertinent year—1967 to 1972—was Goller, who used the trails only on Sundays, beginning when he was 10 years old and continuing until he was approximately 15. Further, the trial court's findings that "[m]ost of the legacy hikers regularly hiked from the bottom of the Trail at Lake Drive all the way to the peak," that "the peak, with its survey marker, is the logical and obvious destination for any hiker on the Trail," and that "a substantial number of the other hikers were hiking to the peak too" are all unsupported. Of the seven legacy hikers who used the trails in the relevant time period, only four testified they ever hiked to the peak, and only one, Goller, testified he did so regularly (on Sundays). Harris and Hemingway, who hiked the Hastain Trail four to five times a week in the summers of 1970 and 1971, hiked to the peak only once or twice a week in those two summers. Foran went to the peak a total of six or seven times in 1971. The trial court's finding that "most of the hikers" saw other hikers "throughout the length of the trail" is also unsupported. None of the legacy hikers testified he or she ever saw anyone else on the Peak Trail. Five of the six legacy hikers who saw others testified only that they saw them on "the trail," which in context meant the Hastain Trail, not the Peak Trail. Only Harris testified he saw people "all over the trail," which could be taken to mean also on the Peak Trail, but in context he was speaking of the trail from Lake Boulevard to Coldwater Canyon, which is the Hastain Trail. Harris testified about the Peak Trail separately, and did not say he ever saw anyone else on it.

25

Thus in 1967, 1968, 1969 and 1972, and most of 1970 and 1971, the only legacy hiker on the Peak Trail was Goller, who hiked only on Sundays.  The trial court could not fairly infer solely from his example that others used the Peak Trail any other day.[6]

Even were we to assume Goller, Harris, Hemingway and Foran saw others on the Peak Trail, their own use was so sparse—Sundays for Goller, one or two days a week during two summers for Harris and Hemingway, and six or seven trips in 1971 for Foran—that their experience does not reasonably imply a substantial number of other hikers used the trail at other times or on other days.  Therefore, no reasonable owner could have been put on notice that the Peak Trail was in danger of public dedication.  The court found additional evidence of substantial use of the Peak Trail from the fact it had not become overgrown, which it would if unused.  But no evidence suggested how much or what kind of use was necessary to prevent the trail from becoming overgrown.  For all we know, the Sunday use by Goller and his friends would have sufficed.  The issue is not whether the trail was used enough to retain its character as a trail, but whether the use was substantial enough to indicate to the owner that his property was in danger of being dedicated.

## III.    Defendants' Other Arguments

In light of our conclusion that the Judgment Trail was improperly dedicated, we need not address defendants' arguments concerning the scope of the trail, the equities involved in relocating it, or the extent of the interest dedicated.

---

[6] For a statistical inference from a sample (the legacy hikers) to a population (a substantial number of hikers) to be justified, the "sample must be sufficiently large to provide reliable information about the larger group.  'How many cases need to be sampled?  This depends in large part on the variability of the population.  The more diverse the population, the larger the sample must be in order to reflect the population accurately.'" (*Duran v. U.S. Bank National Assn.* (2014) 59 Cal.4th 1, 42.)  "Sampling is a methodology based on inferential statistics and probability theory.  'The essence of the science of inferential statistics is that one may confidently draw inferences about the whole from a representative sample of the whole.' [Citation.]  Whether such inferences are supportable, however, depends on how representative the sample is.  '[I]nferences from the part to the whole are justified [*only*] when the sample is representative.'" (*Id.* at p. 38.)  Here, Goller is a sample of one.

## IV.    Attorneys' Fees

Defendants appealed from the order awarding attorneys fees to Scott and the Friends of the Hastain Trail.  Because the judgment is reversed, the award of fees is also reversed.  (*Samples v. Brown* (2007) 146 Cal.App.4th 787, 811.)

## DISPOSITION

The judgment and attorney fee award are reversed.  The trial court is ordered to enter a new judgment in favor of defendants consistent with this opinion.  Costs on appeal are awarded to defendants and appellants.

CERTIFIED FOR PUBLICATION.


CHANEY, J.


I CONCUR:


ROTHSCHILD, P. J.

ROTHSCHILD, P. J., Concurring

I would make one further point.  Although the defendants may have raised equitable arguments and proposed their Alterative Trail Easement too late in the proceedings below, the court was mistaken when it expressed its belief that it did not have the power to consider equitable arguments in deciding where to locate the easement. Because the causes of action and relief plaintiffs prayed for were equitable, the court had the power to consider an equitable resolution—the defendants' proposed Alternative Trail Easement.

In determining whether an action is legal or equitable, we look at the substance of the complaint; "i.e., to the nature of the right involved and the remedy sought." (3 Witkin, Cal. Procedure (5th ed. 2008) Actions, § 123, p. 202.)  Here, plaintiffs alleged causes of action for quiet title and requested injunctive relief.  In particular, they sought a judicial determination that defendants' predecessors had impliedly dedicated a trail for public recreational use, "as well as a determination of the location and dimensions of the public easement."  They also sought injunctive relief to prevent defendants from interfering with the public's use of the trail.  Plaintiffs did not seek damages.

The claims and remedies are entirely equitable in nature.  (See *Aguayo v. Amaro* (2013) 213 Cal.App.4th 1102, 1109 [quiet title is ordinarily equitable]; *Sherwood v. Ahart* (1917) 35 Cal.App. 84, 87 [claim for an implied-in-law dedication of land for public use as a road was "not an action at law but one in equity"]; *Mesa Shopping Center-East, LLC v. O. Hill* (2014) 232 Cal.App.4th 890, 901 [injunctive relief is an equitable remedy, not a cause of action].)  Therefore, these claims are governed by equitable principles, and the court had the power to consider defendants' proposed Alternative Trail Easement.

In addition to considering the equities between the parties, a court may also consider the public policy favoring the productive use of land.  (See, e.g., *Daywalt v. Walker* (1963) 217 Cal.App.2d 669, 672 [referring to the "sound public policy that lands should not be rendered unfit for occupancy"].)  Here, the property was zoned for housing, and defendants had obtained permits to proceed with the project.

Where a fee owner can make a showing that an alternative route will result in an equal or better hiking trail and at the same time allow productive use of the remaining land, it makes no sense not to consider the claim. Precluding such consideration not only deprives a fee owner of the most economically viable use of the land but also deprives future, prospective homeowners of the opportunity to enjoy a home on that land. An alternative trail, on the other hand, which meets the criteria I describe, would accommodate the interests of both the current fee owner and future homeowners, as well as the public's interest in a trail; a win-win situation.

Nothing in *Gion v. City of Santa Cruz* (1970) 2 Cal.3d 29, or its progeny precludes a court's evaluation of equitable considerations in deciding issues concerning implied dedication and the location of an implied easement. Indeed, in *County of Los Angeles v. Berk* (1980) 26 Cal.3d 201, the defendant property owners asserted equitable arguments—estoppel and laches—as defenses to the plaintiffs' implied dedication claims. Both the trial court and the Supreme Court considered these defenses on the merits. (*Id.* at pp. 221-222.) Although the owners' arguments were rejected, the Supreme Court did not hold or suggest that equitable defenses had no place in an implied dedication case or that the trial court was powerless to consider an equitable resolution. Likewise, nothing in the court's opinion in this case should be construed as precluding courts from considering such an equitable resolution.

ROTHSCHILD, P. J.

CHANEY, J., Concurring

I concur with the opinion in order to express an individual view on two issues.

First, even if substantial use of a fire road could ripen into public dedication of the servient tenement, no substantial evidence supports the trial court's finding that the Hastain Fire Road experienced such use.

"[W]here an intent to dedicate is implied as a legal fiction from the nature of public usage, the caselaw requires a high standard of usage, lest private property rights be too easily diminished." (*Hanshaw v. Long Valley Road Assn.* (2004) 116 Cal.App.4th 471, 482.) "The use must be substantial, diverse, and sufficient, considering all the circumstances, to convey to the owner notice that the public is using the passage as if it had a right so to do." (*Friends of the Trails v. Blasius* (2000) 78 Cal.App.4th 810, 826, fn. 7.) Factors to consider include the nature of the property, its physical condition, the owner's knowledge (actual or imputed) of public use of the property, and the frequency and nature of the use. (See, e.g., *Union Transp. Co. v. Sacramento County* (1954) 42 Cal.2d 235, 241 ["general appearance, location and evident purpose of" property, the nature of the public's use of it, and the owners' knowledge of the use are considered when determining whether dedication occurred].)

Here, the only legacy hiker to have used the Hastain Trail every pertinent year was Goller, beginning when he was 10 years old, who used the trails only on Sundays. Harrow used the trail during only four of the five prescriptive years, having been away at college in 1969. Carl used the trail only after October 1968, and never hiked during the summer months. Harris and Hemingway hiked only six months, in the summers of 1970 and 1971. And Foran and Saul used the trail eight times between them in 1971. Thus for 21 months of the prescriptive period, from March 1967 to September 1968 and from January to March 1972, only Goller and Harrow used the Hastain Trail, and only on weekends. Carl began hiking the trail in October 1968, using it between zero and eight days per month for seven months out of the year. In 1969, Harrow went off to college, leaving Goller as the only hiker (and only on Sundays) from May to September 1969, joined by Carl during the other seven months. In 1970, Harrow returned, and Harris and

Hemmingway began hiking in the summer, when Carl was absent. In 1971, with the addition of Foran and Saul, all seven legacy hikers used the trails.

I recognize the real issue is not how much the legacy hikers used the trail but how much usage may fairly be inferred from their observations while using it. (E.g., *Burch v. Gombos* (2000) 82 Cal.App.4th 352, 357 [three legacy users testified about other users].) Here, Goller testified he observed 8 to 20 people over the course of each of his hikes, and Harrow saw between 2 and 12 people each day he was on the trail. Carl's experience was similar, as she occasionally saw groups of 2 to 4 on the trail. And this roughly matches the experiences of Harris and Hemingway, who saw between 6 and 20 people during their hikes, and to a lesser extent Foran, who would see 1 or 2 others. (Saul saw no one else.)

These observations support the trial court's finding that the legacy hikers saw an average of "about three to four other hikers" on the Hastain Trail.

When it extrapolated the legacy hikers' experience "over the hours of the day and days of the year" to conclude that "thousands"[1] of hikers used the Hastain Trail during the prescriptive period, the court drew at least two reasonable inferences from the legacy hikers' observations. First, the court reasonably inferred use of the trail was basically uniform over the hiking hours of any given day. Because the Legacy hikers testified to using the trail for one or two hours per trip and to seeing other hikers each trip,[2] it is reasonable to infer that others used the trail at other times on those days. The alternative hypothesis—that on every trip those encountered on the trail were the trail's only other users that day—would be highly unlikely. In a similar vein, it was also reasonable, with an exception we will discuss below, for the court to assume that usage was basically uniform from one day to the next. Legacy hikers used the Hastain Trail approximately

---

[1] "Thousands" of hikers over the prescriptive period is not necessarily substantial. Because the prescriptive period contained 1,827 days, "thousands" could mean as few as one to two users per day. We assume the trial court used the term in its nonspecific sense.

[2] I discount Saul's experience as an outlier.

2

one day out of three.  That other users were encountered on each trip suggests even more hikers were there on days no legacy hiker went.  Again, the alternative hypothesis, that visitors used the trail only on the days they were encountered by legacy hikers, is unlikely.

But the court could not reasonably infer from the legacy hikers' observations that the Hastain Trail saw substantial weekday use throughout the year, because for 54 out of 60 prescriptive months there is no evidence any legacy hiker used the trail on any weekday.  Goller and Harrow used it only on weekends, and neither Carl, Foran nor Saul specified which days they hiked.  Even taking into account the experience of Harris and Hemingway, the summer, weekday hikers, there would still be no reason to infer several individuals used the trail on any non-summer weekday.  The alternative hypothesis, that the trail was *not* much used during weekdays in the nonsummer months, is reasonable, because days are shorter and people have jobs and school.

True, plaintiffs were not required to prove the public used the Hastain Trail every day, as the standard is only that the use be substantial.  The "'thing of significance is that whoever wanted to use [the land] did so . . . when they wished to do so without asking permission and without protest from the land owners.'"  (*Gion v. City of Santa Cruz* (1970) 2 Cal.3d 29, 40, quoting *Seaway Co. v. Attorney General* (Tex.Civ.App. 1964) 375 S.W.2d 923, 936.)  But the use here does not qualify as substantial.  It necessarily follows from the legacy hikers' experience of encountering "three to four" others on the trail that a reasonable owner on the trail would have a similar experience, and would be put on notice that the property was used only by a handful of persons on weekends, and perhaps also on summer weekdays.  This use can be described only as casual, exactly the sort an owner would permit because it does no harm and to refuse would be churlish and unreasonable.  Such limited use would not put the owner on notice that the land was in danger of public dedication.  Plaintiffs therefore made no showing that contradicted the idea of license, and therefore failed to satisfy *Gion*.

I would also hold that as a matter of law use of the Peak Trail by minors neither demonstrated a reasonable belief by the public that it had a right to use the property nor put defendants on notice the property was subject to public dedication.

Public dedication requires that "the public demonstrate through its actions that its members believed that they had a right to use the property." (*County of Los Angeles v. Berk* (1980) 26 Cal.3d 201, 216.) The belief must be reasonable. (*Ibid.*) But minors generally have a limited understanding of the rights attendant to ownership of real property and restrictions on its use by non-owners, and are as like to believe they may enter any property at will. They are born trespassers, and it would be unreasonable for an adult to believe a minor's entering onto private property reflects even the minor's right to do so, much less a public right. Therefore, use of private property by children neither demonstrates the public's reasonable belief that it has a right to use the property nor affords notice to the owner that the property is subject to dedication to the public.

Here, the only users of the Peak Trail for four of the five prescriptive years, 1967, 1968, 1969 and 1972, and the nonsummer months of 1970 and 1971, were Goller and his companions. Most of the time these users were minors. Goller went with his father when he was 10 years old and with his cub scout den—with an adult leader—when he was 11, but when he was 12, 13, 14, and perhaps 15, he visited the Peak Trail exclusively with his friends, who presumably were minors like him. Foran, another user in 1971, was also a minor. Neither testified to seeing anyone else specifically on the Peak Trail.

This use of the Peak Trail was insufficient to support a finding of public dedication.


CHANEY, J.

4

JOHNSON, J., Dissenting.

I respectfully dissent.

The majority opinion not only distorts but also changes the law of implied dedication to reverse the trial court's judgment in favor of Friends of the Hastain Trail and Mountains Recreation and Conservation Authority (MCRA) (collectively, Friends). The opinion bases its conclusions on factual assumptions not supported by the record, decides issues Coldwater Development LLC and Lydda Lud, LLC (collectively, Hadid) did not raise at trial or on appeal, and gets our standard of review backward, all to reach a result precluded by proper application of established law and unsupported by the trial court's findings of fact. The result of the majority's revisionist approach to this case is that much of the Hastain Trail, which has been used by the public for more than 50 years and which I believe the trial court correctly found was impliedly dedicated to the public at least 44 years ago, will now be lost forever to public use.

In *Gion v. City of Santa Cruz* (1970) 2 Cal.3d 29 (*Gion*), the California Supreme Court concluded that an implied dedication of private land (three parcels of land on a shoreline, and a beach and the road leading to it) for public use occurred when the public had made use of the land for more than five years without objection by the owners. "[U]se by the public for the prescriptive period without asking or receiving permission from the fee owner [and] no evidence that the respective fee owners attempted to prevent or halt this use" meant "as a matter of law that a dedication to the public took place." (*Id.* at p. 44.) "What must be shown is that persons used the property believing the public had a right to such use. This public use may not be 'adverse' to the interests of the owner in the sense that the word is used in adverse possession cases. If a trial court finds that the public has used land without objection or interference for more than five years, it need not make a separate finding of "'adversity'" to support a declaration of implied dedication." (*Id.* at p. 39.) "Litigants . . . seeking to show that land has been dedicated to the public need only produce evidence that persons have used the land as they would have used public land," in the case of a beach or shoreline, "as if it were a public recreation area," and if a road, "as if it were a public road." (*Ibid.*) The evidence must

demonstrate that various groups of persons, "not a limited and definable number of persons," have used the land "'when they wished to do so without asking permission and without protest from the land owners.'" (*Id.* at pp. 39–40.) "If the fee owner proves that use of the land fluctuated seasonally, on the other hand, such a showing does not negate evidence of adverse user." (*Id.* at p. 40.)

"For a fee owner [during the five-year prescriptive period] to negate a finding of intent to dedicate based on uninterrupted public use for more than five years . . . he must either affirmatively prove that he has granted the public a license to use his property or demonstrate that he has made a bona fide attempt to prevent public use. Whether an owner's efforts to halt public use are adequate in a particular case will turn on the means the owner uses in relation to the character of the property and the extent of public use. Although 'No Trespassing' signs may be sufficient when only an occasional hiker traverses an isolated property, the same action cannot reasonably be expected to halt a continuous influx of beach users to an attractive seashore property. . . . If the owner has not attempted to halt public use in any significant way, however, it will be held as a matter of law that he intended to dedicate the property or an easement therein to the public, and evidence that the public used the property for the prescriptive period is sufficient to establish dedication." (*Gion*, *supra*, 2 Cal.3d at p. 41.)

"Most of the case law involving dedication in this state has concerned roads and land bordering roads. [Citations.] This emphasis on roadways arises from the ease with which one can define a road, the frequent need for roadways through private property, and perhaps also the relative frequency with which express dedications of roadways are made." (*Gion*, *supra*, 2 Cal.3d at p. 41.) Implied dedication rules apply with equal force, however, to purposes other than a roadway, such as park land, athletic fields, and beaches. (*Ibid.*) "This court has in the past been less receptive to arguments of implied dedication when open beach lands were involved than it has [been] when well-defined roadways are at issue," but increased urbanization, the intensification of land use, and the public policy in favor of expanding public access to shoreline areas "leads us to the

2

conclusion that the courts of this state must be as receptive to a finding of implied dedication of shoreline areas as they are to a finding of implied dedication of roadways." (*Id.* at p. 43.)

"The present fee owners of the lands in question have of course made it clear that they do not approve of the public use of the property. Previous owners, however, by ignoring the wide-spread public use of the land for more than five years have impliedly dedicated the property to the public. Nothing can be done by the present owners to take back that which was previously given away. In each case the trial court found the elements necessary to implied dedication were present—use by the public for the prescriptive period without asking or receiving permission from the fee owner. There is no evidence that the respective fee owners attempted to prevent or halt this use. It follows as a matter of law that a dedication to the public took place." (*Gion*, *supra*, 2 Cal.3d at p. 44.)

After its partial abrogation by the enactment of Civil Code section 1009, *Gion*, *supra*, 2 Cal.3d 29 continues to apply to implied dedication claims preceding March 4, 1972. (*Friends of the Trails v. Blasius* (2000) 78 Cal.App.4th 810, 822 (*Blasius*).)

The majority opinion purports to follow *Gion*, *supra*, 2 Cal.3d 29, but in reversing the trial court's judgment in favor of judgment in favor of Friends the majority reinvents the law of implied dedication.

## I.   No "fire road" easement prevents implied dedication.

The majority concludes that the lower portion of the Hastain Trail (Trail) runs over a fire road (the intended meaning of that term is undefined in the record),[1] and therefore that portion of the Trail cannot be subject to implied dedication to the public. (Maj. opn. *ante*, at p. 23.) But "[m]ost of the case law involving dedication in this state has concerned roads and land bordering roads." (*Gion*, *supra*, 2 Cal.3d at p. 41.) In *Burch v. Gombos* (2000) 82 Cal.App.4th 352, the trial court found implied dedication to

---

[1] As I explain below, nothing in the record indicates when or if the road has been under the auspices or control of any public agency.

3

the public of a one-lane dirt fire road constructed in the 1930's under licenses between the original landowners and the California Department of Forestry (which stopped maintaining the fire road sometime in the early 1970's), based on three witnesses' testimony of public recreational use of the fire road before 1972. (*Id.* at pp. 356, 358.) The landowners at the time of trial appealed, arguing that the trial court erred in admitting evidence of the public use of the fire road, and contending that the evidence did not support dedication sufficient to permit the respondent's logging operations. (*Id.* at p. 355.) The appellate court applied *Gion*, *supra*, 2 Cal.3d 29, concluded "substantial evidence supports the finding of an implied dedication," and remanded to the trial court to determine whether logging operations were within the scope of the resulting public easement over the fire road. (*Burch*, at pp. 355, 361, 362–363.) An existing fire road—even one that was under license with a public agency during the dedication period—is not an obstacle to establishing implied dedication, and public recreational use of a fire road may result in dedication to the public outlasting the fire road itself.

Further, the majority's factual statement gives the existence of a fire road unjustified prominence and a certainty unsupported by any substantial evidence in the record. Throughout the trial, witnesses (including the legacy hikers and experts on aerial photography) described the Trail as running in large part on a fire road with no definition of the term. Some witnesses used the terms fire road and Hastain Trail interchangeably. Where the trail coincided with a fire road, the wider path meant better defined images of that portion of the trail on aerial photographs. Additional testimony focused on a narrower peak trail that ran from the lower portion of the trail to a medallion at the summit. The trial court's statement of decision includes these factual findings: "The Trail consists of an old fire road leading from Lake Drive up the hill until very near the peak. At that point, the Trail veers east from the fire road up to the peak. The fire road is to the west of the peak. To avoid confusion, the term 'Trail' shall refer to the entire trail from Lake Drive to the peak. The term 'Fire Road' shall refer to that portion of the Trail which is the old fire road. The Fire Road is that portion of the survey, attached as

4

exhibits A and B, of the Trail which is 15 feet wide." (I will use the terms "Trail," "Fire Road," and "Peak Trail" as did the trial court.) The Fire Road was constructed by 1940 to replace a fire road or fire break that went over the peaks of several hills and was abandoned, becoming overgrown where not used by hikers. The court found: "[T]he public use of the Trail was open and obvious. The existence of the Fire Road by itself across the properties should have put any prudent owner or purchaser on inquiry as to the use of the Fire Road, and any reasonable inquiry or observation would have disclosed the public use of the Trail." "Near the summit, the Peak Trail branches off east from the Fire Road. Based on the aerial photographs and the testimony of the legacy hikers, it is clear that the public hiked to the peak along the Peak Trail and therefore had to use the Fire Road to get there." Hadid's 2004 grading created a slight modification to the peak trail which meant "hikers must now travel a little further up along the Fire Road" to access the peak trail.

The majority makes unsupported appellate findings of fact regarding the Fire Road. "Absent exceptional circumstances, no such findings should be made. [Citation.] There are no exceptional circumstances in the instant case." (*Tyrone v. Kelley* (1973) 9 Cal.3d 1, 13.) The record does not contain any legal description of the Fire Road, any recorded easement related to the Fire Road, or any testimony from a fire department or from an expert on fire roads. No evidence whatsoever establishes which fire department created the Fire Road, or the status of the Fire Road during the five-year implied dedication period from March 1967 to March 1972. Hadid had the burden to present evidence at trial of any preexisting easement on the Hastain Trail that would defend against implied dedication, but he presented none. Hadid did not request factual findings regarding the Fire Road or argue at trial or on appeal that the presence of the Fire Road was dispositive of the status of the Trail. When invited to submit supplemental briefing on the issue, Hadid provided no evidence suitable for judicial notice regarding the Fire Road. Just as there is no evidence that there was a fire road easement in place on the Fire

5

Road during the dedication period, there is no evidence regarding if and when any such easement was created or abandoned.

Despite this complete dearth of evidence, the majority inexplicably concludes that there was a "public easement" on the Fire Road throughout the five-year implied dedication period and therefore the legacy hikers' use of the Fire Road could not have put the property owners on notice of possible dedication of the Trail to the public for recreational use. This edict must be seen and highlighted for what it is—judicial fiat; it is legally wrong and unsupported by facts in the record.

The majority cites Los Angeles Municipal Code (LAMC) sections providing that the fire chief can create and maintain fire roads when necessary to protect life and property, and such roads are "granted to the City without cost as easements from a public street or alley to the required terminal point." (LAMC § 57.503.1.6.) (Maj. opn. *ante*, at pp. 18–19.) The majority can point to no evidence that the Fire Road was created pursuant to the LAMC, or that the Fire Road continued to be such a fire road during the dedication period. Even if such evidence existed, by the terms of the LAMC any resulting easement would have been granted *to the city*, not to the general public, for the purpose of allowing the city access to fight fires. The majority also errs in stating, without factual or legal support, that a fire road easement granted to the city would allow the underlying property owners to reasonably contemplate that the general public would use the fire road for hiking and dog-walking. (Maj. opn. *ante*, at p. 20.) As far as I can tell, there is no basis for this conclusion other than the mere prestidigitation of a justice's pen. There was no testimony to this effect. Consistent passage by hikers on a fire road would serve as notice to a landowner that the road was being used as a hiking trail, and as I explain more fully below, would be adverse to the private landowner for the purposes of implied dedication. (See *Burch v. Gombos*, *supra*, 82 Cal.App.4th at p. 355.)

Even if the record contained evidence that the city had been granted an easement over the Fire Road that was in place during the five-year dedication period, the hikers' use of the Fire Road was adverse to the owners of the private property underlying the Fire

6

Road and continuous use would have given the owners notice that the Fire Road was being used as a hiking trail.[2] "It is established law that one, while recognizing a superior title or right in a governmental entity, may nevertheless adversely possess land as against others," including those holding the private fee interest underlying a government easement. (*Abar v. Rogers* (1972) 23 Cal.App.3d 506, 513–514.) And as any easement for fire control purposes would be the city's, not the general public's, the use the legacy hikers and others made of the Trail could not and did not constitute increased use by the holder (a public agency or public entity) of a fire road easement.

In *Blasius*, *supra*, 78 Cal.App.4th 810, private landowners appealed from a judgment concluding that under *Gion*, *supra*, 2 Cal.3d 29 the public acquired by implied dedication an easement on a road for "walking, jogging, riding bicycles and horses, and fishing in the Rattlesnake Canal," subordinate to an existing written easement of record in favor of the Nevada Irrigation District, which maintained and operated the canal area for irrigation purposes. The canal consisted of a ditch 16 feet wide and an adjacent berm. Atop the berm was a nine-foot-wide road used and maintained by the irrigation district for canal access, maintenance, and repair. The landowners holding the underlying fee interest blocked the canal road with a locked gate at each end of the section of the road on their land, allowing access only to themselves and the irrigation district, and Friends of the Trails filed a complaint against the landowners and the district to quiet title to a public easement for recreational purposes. At trial, witnesses testified that "'various people, young and old'" used the canal road from the 1940's to 1971 for jogging, walking, riding bicycles or horses, fishing, and walking to and from school and other places, all believing (as did the hikers in this case) that it was a public right of way. (*Blasius*, at pp. 817–819.) The appellate court approved the trial court's application of *Gion* to a claim of implied public "dedication of rights-of-way for pedestrian, equestrian, and bicycle travel" on the

---

[2] No fire department is a party, and there is no evidence of any public entity seeking to prevent the public from hiking on the fire road. The two legacy hikers asked whether they ever saw fire vehicles on the fire road testified that they saw none.

7

road, as "[w]ell within the . . . reach of the common law of dedication is the establishment of a public footway. [Citations.] There is no principled basis for not applying the rule of implied dedication to any 'highway,' within the generic usage of that term, to all sorts of public ways, e.g. to a bridle-way, bicycle path, or any combination of such use as a right-of-way." (*Blasius*, at p. 824.) Characterizing "'adversity'" in implied dedication cases as "whether 'persons have used the land as they would have used public land,'" *Blasius* concluded that *Gion* "plainly contemplates that 'adversity' for purposes of implied dedication may arise as to recreational pedestrians in rural areas." (*Blasius*, at pp. 824–825.) While "'an occasional hiker travers[ing] an isolated property'" might not be sufficient for implied dedication, "a long history of continued passage by a diverse group of occasional hikers across a well defined privately owned trail segment leading to a network of trails, say on a public wilderness area, might suffice." (*Id.* at p. 825 & fn. 7.) The court also rejected the argument that a public easement established by implied dedication was precluded by the preexisting easement in a public entity (the irrigation district), as the district did not show the easements were incompatible. (*Id.* at p. 826.)

*Blasius*, *supra*, 78 Cal.App.4th 810 affirmed a judgment finding implied dedication to the public for recreational purposes over privately owned property, on an access road governed by a written easement belonging to a public entity that used and maintained the road for the purpose of repairing and maintaining an adjacent canal. Even if the evidence had shown an existing easement on the Fire Road belonging to a public entity who maintained the road for fire control purposes, the long history of use of the well-defined Fire Road by a diverse group of hikers entering and leaving a network of trails on a public wilderness area would be sufficiently adverse to establish a public trail easement by implied dedication.[3] As I explain below, substantial evidence established that public easement over the entire trail.

---

[3] The majority's conclusion that *Blasius*, *supra*, 78 Cal.App.4th 810 does not apply because the description of the Hastain Trail easement (as stipulated to by the parties) in an exhibit to the judgment included the metes and bounds is puzzling. (Maj. opn. *ante*, at p. 22.) A metes and bounds description in a judgment does not change the

8

Contrary to the majority's assertion (maj. opn. *ante*, at p. 23), we are aware of no case (and the majority cites none) which holds that an owner can remove a road that has been impliedly dedicated to the public. This dualism is another example of the arbitrariness of the majority decision. No principled basis exists for the majority's conclusion that no matter how substantial the public use of the Trail during the dedication period, the existence of the Fire Road prevents implied dedication to the public of the lower portion of the Trail. This conclusion is a glaring departure from existing precedent.

## II.     Substantial evidence supports public dedication of the Peak Trail.

To conclude that the use of the Peak Trail was "miniscule" and therefore insufficient to establish implied dedication, the majority states: "The issue is not whether the trail was used enough to retain its character as a trail, but whether the use was substantial enough to indicate to the owner that his property was in danger of being dedicated." (Maj. opn. *ante*, at pp. 24, 25–26.) The majority requires more of respondents and the trial court than the law demands. As *Gion*, *supra*, 2 Cal.3d 29 explained, litigants seeking to show implied dedication must show only that the public has used the land as they would have used public land *for the use the litigants seek to establish*, in the case of a beach or shoreline, "as if it were a public recreation area," and in the case of a road, "as if it were a public road." (*Id.* at p. 39.) Friends needed to show

---

nature of the easement, but rather determines the exact contours of the public right of way. In *Western Aggregates, Inc. v. County of Yuba* (2002) 101 Cal.App.4th 278, 289, 307, the court affirmed the trial court's finding of a historical public road on private property, but remanded for a determination of the metes and bounds to establish the exact route and width of the public road "as . . . necessary to define the public road now running" through the private property. The majority's conclusion is also speculative. The appellate opinion in *Blasius* does not include the entire judgment, which very well may have included a precise description of the easement in metes and bounds. (*Blasius*, *supra*, 78 Cal.App.4th at pp. 819–820.)

Further, if the irrigation district in *Blasius* constructed another canal elsewhere there is no reason why the public could not continue to use the impliedly dedicated public easement on the road adjacent to the former canal after the district no longer maintained the road.

9

that the public used the Peak Trail as if it were a public hiking trail, not, as the majority would require, that the use met some otherwise unspecified standard. Testimony established that during the dedication period hikers regularly traversed the Peak Trail as if it were a public hiking trail, and historical aerial photographs showed the hikers' use made the Peak Trail visible. Under the majority's standard, even if (as here) a trail was used sufficiently "to retain its character as a trail," (maj. opn. *ante*, at p. 26) that use could not establish public dedication. As *Blasius*, *supra*, 78 Cal.App.4th 810 pointed out, the inference of public use is available "as to recreational pedestrians in rural areas," including when the evidence shows hiking on an isolated property: "'"No Trespassing" signs may be sufficient [to demonstrate a bona fide attempt by the landowner to prevent public use] when only an occasional hiker traverses an isolated property. . . .' (*Gion-Dietz*, *supra*, 2 Cal.3d at p. 41.) The owner would have no occasion to rebut the finding of 'adverse' public use unless that inference were available." (*Blasius*, at p. 825.)

The majority's conclusion that sufficient evidence did not establish use of the peak trail also violates the fundamental substantial evidence rule. When an appellant attacks a court's finding as not sustained by the evidence, "the power of an appellate court begins and ends with the determination whether there is any substantial evidence, contradicted or uncontradicted, which will support the verdict. Questions of credibility must be resolved in favor of the factfinder's determination, and when two or more inferences can reasonably be drawn from the evidence, a reviewing court may not substitute its deductions for those of the trier of fact. If on any material point the evidence is in conflict, it must be assumed that the court . . . resolved the conflict in favor of the prevailing party." (*Abar v. Rogers*, *supra*, 23 Cal.App.3d at p. 510.) By analogy, where the law of implied dedication would only require proof that for the prescriptive period various sandlot baseball games occurred regularly and frequently on private property, the majority seemingly requires proof of team rosters (with a full team of at least nine players on each side), uniform colors, and evidence of games year-round with no off-season and no rainouts.

10

At every turn, the majority construes the evidence against Friends, the prevailing party, belittles and minimizes the uncontradicted testimony of the legacy hikers, and fails to mention other evidence in the record supporting the trial court's findings. I begin with the majority's statement that a number of the trial court's specific findings are unsupported in the record. (Maj. opn. *ante*, at p. 25.) To the contrary, each of the findings is supported by substantial evidence.

First, the trial court found: "Several of the legacy hikers hiked the Trail during each of the years from 1962 to 1972." The majority asserts that this is wrong because only one legacy hiker testified he hiked the Trail *every* year from 1967 to 1972. (The relevant time period is March 4, 1967 to March 4,1972.) The trial court stated only that in *each* year, several hikers hiked the Trail, not that several hikers hiked the Trail every year.

Second, the trial court found: "Most of the legacy hikers regularly hiked from the bottom of the Trail at Lake Drive all the way to the peak." Four legacy hikers testified they regularly hiked all the way to the peak. James Goller stated he and his father "[just about] all the time" went up to the medallion at the peak, and when he hiked with the Cub Scouts they would go all the way to the top too. Frederic Harris and Carole Hemingway hiked to the peak once or twice a week in the summers of 1971 and 1972. Cynthia Foran hiked to the medallion at the peak in 1971 six or seven times with her brothers and with friends. The trial court's conclusion is amply supported by the testimony of four of the seven legacy hikers.

Third, the trial court found: "From the testimony and the court's own observation of the Trail, the peak, with its survey marker, is the logical and obvious destination for any hiker on the Trail." It is undisputed that at the time of the trial court's visit to the site of the Trail and during the years from 1967 to 1972, a medallion marked the top of the Peak Trail. Harris testified that there was a marker at the peak of the trail. Hemingway testified that she and Harris often hiked up to the medallion, and the medallion was "a place where we would say, okay, let's go back down again." Goller testified he

11

remembered finding the medallion unusual and asking his father about it, and reaching the medallion was the challenge of hiking the trail. Foran testified that at the highest point of the trail there was a medallion in the ground. Paul Edelman, who worked as chief of natural resources and planning for the Santa Monica Mountain Conservancy and also worked for the MCRA, testified that the peak of the Trail was a "key resource[]" of Franklin Canyon Park because it allowed the public to hike up high enough to get the view. Keith Lehrer, who hiked the trail in 1965, testified that he, his friend, and his friend's father would hike all the way up for the 360-degree view at the medallion, which his friend's father "jokingly referred to it as something from the space aliens . . . . [¶] . . . [¶] It was a big event when we went to the space marker." A marker at the peak of a trail is a logical and obvious destination for hikers, as it was for the majority of the legacy hikers testifying at trial.

Fourth, the trial court found: "Most legacy hikers testified . . . that the other hikers were seen throughout the trail," and "a substantial number of the other hikers were hiking to the peak too." Harris testified that he saw half a dozen to a dozen people when he hiked the Trail, and he saw the same number of people on the Peak Trail. Hemingway testified she consistently encountered between a dozen to 15 or 20 other people on the trail (including groups with a leader) on the course of her entire hike and "going all the way up." Goller testified he almost always saw eight to 20 people on his entire trip going up and down, including groups of six people. On direct and cross-examination, Foran testified she saw "two to four" others on the entire area of the Trail each time she hiked.

Additional substantial evidence supported travel over the Peak Trail. The trial court concluded that Friends' aerial photography expert, Brian Bradshaw, was credible when he testified that aerial photography during the implied dedication period showed a trail leaving the Fire Road and heading north to the peak and that the lack of vegetation showed usage of the Peak Trail. The majority's complaint that "no evidence suggested how much or what kind of use was necessary to prevent the trail from becoming overgrown" (maj. opn. *ante*, at p. 26) refuses to credit the trial court's factual finding

12

because *Hadid* did not meet his burden to challenge it. Although Robert Pope, Hadid's aerial photography expert, testified that he did not see a defined trail, I defer as I must to the trial court's finding that Bradshaw was credible, and the trial court was entitled to resolve conflicts in the evidence. Even Pope did not dispute that a variety of people could have hiked up to the peak and the medallion in 1968 to 1971 or thereabouts.

The majority opinion misapplies the law, jettisons its obligation to construe the evidence in favor of the prevailing party, and misconstrues the record. Strong precedent and sufficient evidence support the trial court's findings regarding the Peak Trail.

### III.    Substantial evidence supported the public dedication of the Fire Road.

Justice Chaney's concurrence requires evidence of uniform use of the Fire Road, in direct conflict with *Gion*, *supra*, 2 Cal.3d 29. The concurrence admits that it was reasonable for the trial court to infer substantial use of the Fire Road on the weekends, but concludes that the court could not infer similar use during the week. (Conc. opn. of Chaney, J. *ante*, at p. 3.) This approach would require that testimony establish that the same number of hikers were on the Fire Road every day of the year regardless of the season. Evidence of uniform and uninterrupted use by the public is not required to establish implied dedication. In *Gion*, the court described evidence showing large numbers of people on Navarro Beach "at times," and visits by schoolchildren "during good weather," and expressly rejected the concurrence's approach: "If the fee owner proves that use of the land fluctuated seasonally, on the other hand, such a showing does not negate evidence of adverse user. '[The] thing of significance is that whoever wanted to use [the land] did so . . . when they wished to do so without asking permission and without protest from the land owners.'" (*Id.* at pp. 37, 40.) While Justice Chaney admits that weekday use of the Trail would naturally be lower, the concurrence errs in drawing that inference *against* the trial court's finding. (Conc. opn. of Chaney, J. *ante*, at p. 3.) A landowner may have constructive notice of public use of his or her property when that public use ebbs and flows with the rhythms of daily life and the seasons, and the evidence need not establish that the amount of use never varied.

*Blasius*, *supra*, 78 Cal.App.4th 810 described testimony by witnesses that the canal access road was used "'by various people, young and old, families and single persons, friends, guests, visitors and strangers'" including school age children, without specifying days of the week, time of day, seasons, or the number of people on the road. (*Id*. at p. 819.) Similarly, the Fire Road was hiked by various people, young and old, families and single persons, friends, guests from out of town, and visitors, including Cub Scouts and children hiking with their siblings and with parents. *Blasius* explained that "[t]he central question concerns 'adversity'—whether 'persons have used the land as they would have used public land.'" (*Id.* at p. 824.) The testimony here showed that the hikers used the Fire Road as they would have used a public trail, for hiking and dogwalking. In reviewing the landowners' argument that "there is not sufficient evidence to satisfy the *Gion-Dietz*[, *supra*, 2 Cal.3d 29] criteria," the *Blasius* court explained: "[T]he critical question of fact [is] whether the use shown to have been made of the property by the public is '"such that the trier of fact is justified in inferring an adverse claim and user and imputing constructive knowledge thereof to the owner."'" (*Blasius*, at pp. 824–825.) Emphasizing that the testimony showed (as it did in this case) that the public used the road in the belief they had the right to do so, the court observed: "While the anecdotal evidence of such use is inherently difficult to reduce to a precise traffic count, the testimony of the witnesses of their use and observation of others' use affords an inference that such use was far from rare; in the words of the trial court it was 'continuous, regular and open use.'" (*Id.* at p. 825.) Here, no precise traffic count must be calculated from the hikers' testimony to conclude that the trial court could infer the hikers' use of the Fire Road was "open, visible, and notorious."

*Blasius*, *supra*, 78 Cal.App.4th 810 also cautioned that "fact patterns are myriad and the question often imbued with overtones of local norms, customs, and expectations. *That is one reason why such cases, unless clearly outside the range of discretion, generally warrant deference to the local finder of fact.* [¶] The *Gion-Dietz*[, *supra*, 2 Cal.3d 29] opinion plainly contemplates that 'adversity' for purposes of implied

14

dedication may arise as to recreational pedestrians in rural areas." (*Blasius*, at p. 825, italics added.) Testimony established "a long history of continued passage by a diverse group of occasional hikers across a well defined privately owned trail segment," the Fire Road. (*Id.* at p. 825, fn. 7.) As in *Blasius*, the trial court herein did not abuse its discretion when it found that the level of use was sufficient to convey to the landowners during the relevant time that the use was adverse within the meaning of *Gion*. (*Blasius*, at pp. 825–826.)

The concurrence also misapplies the rule of substantial evidence. "[W]e 'must accept as true all evidence tending to establish the correctness of the finding as made, taking into account, as well, all inferences which might reasonably have been thought by the trial court to lead to the same conclusion. Every substantial conflict in the testimony is . . . to be resolved in favor of the finding." (*Hanshaw v. Long Valley Road Assn.* (2004) 116 Cal.App.4th 471, 481.) Justice Chaney minimizes the hikers' testimony and makes every inference against the finding of the trial court that use of the Fire Road was sufficient for implied dedication. Goller testified that he hiked the Trail on Sunday mornings with his father, and he also testified that he hiked the Trail six times with the Cub Scouts and later, when he was in his early teens, he hiked the Trail many times in the afternoons with friends. The reasonable inference is that Goller did not hike only on Sundays, and the trial court could infer that he hiked the Trail during the week. Justice Chaney acknowledges that Harris and Hemingway hiked during the week, but states that Joan Carl, Foran, and Richard Saul did not specify which days they hiked, and then infers that they did *not* use the Trail on weekdays, making an impermissible inference *against* the trial court's findings. (Conc. opn. of Chaney, J. *ante*, at p. 3.) Justice Chaney fails to mention that that on weekdays Harris and Hemingway saw between six to 12 parked cars at the trailhead and that Foran also saw cars parked at the bottom, as the trial court noted in its statement of decision.

Finally, Justice Chaney discounts the testimony of the hikers regarding their experiences as minors, because minors are "born trespassers" and would not have a

15

reasonable belief that they had a right to walk on the Peak Trail. (Conc. opn. of Chaney, J. *ante*, at p. 4.) This is an unsupported assumption, and ignores that the hikers who hiked the Trail when they were minors testified that they believed the Trail was public property and that they had a right to hike it. Evidence of use by minors is relevant to establish implied dedication. In *Burch v. Gombos*, *supra*, 82 Cal.App.4th, one of the three witnesses who testified used the fire road only as a teenager. (*Id.* at p. 357.) Testimony of use by children also was in evidence in *Gion*, *supra*, 2 Cal.3d at p. 37 and in *Blasius*, *supra*, 78 Cal.App.4th at p. 819. On behalf of all young people, I object to this dismissive and broad characterization. Clearly, if our courts have determined that minors may be competent witnesses in the most sensitive of cases, it is reasonable to assume that they can possess the awareness to form an opinion as to whether they have a right to occupy a particular space. Make no mistake, Justice Chaney's concurrence would make a new credibility finding—contrary to that of the trial court—based solely upon a stereotype having no basis in the record or the law. That is not the province of appellate review.

## IV.    The trial court did not have the power to relocate the trail easement.

Presiding Justice Rothschild's conclusion that the trial court had the power to consider an equitable relocation of the Trail has no support in California law or evidence in the record. (Conc. opn. of Rothschild, P. J. *ante*, at p. 1.) The trial court properly recognized that under our Supreme Court precedent, once the Trail was established by implied dedication, the court had no power or obligation to allow Hadid not to respect the easement established by implied dedication. Further, Hadid did not request relocation of the Trail during trial, and no evidence at trial supported relocation of the Trail easement. As the trial court explained in its statement of decision: "Defendants . . . request a finding as to whether the easement would 'deprive Defendants [of] the ability to develop [the property].' That is not an element of a cause of action for implied dedication and is irrelevant. When Defendants acquired the property, they took subject to whatever easements and encumbrances had been created by prior owners. The court makes no

16

ruling on Defendants' development plans, except that the public easement must be respected." The court addressed the merits of Hadid's affirmative defense of laches (the only affirmative defense for which he presented evidence), and after thoughtful discussion, rejected it. The trial court continued: "Even if Defendants had alleged the equitable affirmative defenses (and assuming the defenses apply in the implied public dedication context), Defendants are simply not in an equitable position. Defendants' alleged 'hardship' did not arise until the 21st century. Plaintiffs' rights to a public recreational easement accrued in 1972. Defendants' claim is 40 years too late. As stated in *Gion*, *supra*, [2 Cal.3d] at [p.] 44: 'Nothing can be done by the present owners to take back that which was previously given away.' Nor is compensation part of the analysis," which in this case was not required by equity.

The trial court was correct. Our Supreme Court has not hesitated to apply *Gion*, *supra*, 2 Cal.3d 29 even when implied dedication to the public deprived the owners of any possibility of developing the property. In *County of Los Angeles v. Berk* (1980) 26 Cal.3d 201 (*Berk*), quoted by the trial court, the county and the City of Torrance brought separate actions to establish a "'public beach recreation easement'" on oceanfront property owned by Oscar and Shirley Berk. (*Id.* at p. 206.) After Berk drew up plans for an apartment complex, the cities of Torrance and Redondo Beach each advised him that his plan would require no variances. Berk purchased the property, and with a permit from Redondo Beach, he began construction in February 1971. When he applied for a building permit in Torrance, however, the city filed an action to quiet title to public recreational easements, and the county filed its own action regarding the Redondo Beach portion of the property. (*Id.* at pp. 208–209.) *Gion* had been filed more than six months before he opened escrow on the property, but Berk learned of it only after escrow had closed, and no one in either city had advised him of the decision or its effect. (*Berk*, at pp. 209–210.)

The trial court found an easement arising out of implied dedication for public recreational purposes over the entire property, rejected the affirmative defenses of laches

and estoppel, and denied Berk's cross-complaint for damages. (*Berk*, *supra*, 26 Cal.3d at pp. 210–211). Before the California Supreme Court, Berk argued (among other arguments) that fundamental fairness (including laches and estoppel) barred the result reached in the trial court. (*Id.* at p. 212.) In rejecting the application of estoppel and laches, the court explained: "[A]ny reliance by the Berks on the actions of the governmental entities here involved was clearly unreasonable. It simply cannot be maintained that an existing or prospective property owner, upon being advised by planning and building officials that a given project complies with applicable local codes, thereby gains the right to proceed with that project regardless of the rights of third parties or the public in the property on which it is proposed to be built." (*Id.* at p. 221.) Further, "the owner of property or one proposing to acquire it cannot justify his ignorance of the true state of the facts and the law affecting it by pointing to similar ignorance in government bodies. Negligence . . . cannot be so easily excused in one whose interest is focused upon a particular piece of property." (*Ibid.*)

"As prospective purchasers of the subject property, [the Berks] had at their disposal ample means of informing themselves of all the considerations, legal and otherwise, which might have had an effect on the wisdom of their decision. Rather than availing themselves of the full range of these means, however, they apparently chose to limit their inquiry to those considerations relating to the feasibility of proceeding with their plans in light of applicable zoning and building codes. In so doing they wholly neglected to inform themselves on the current state of the common law and its possible effect on the property they proposed to purchase." (*Berk*, *supra*, 26 Cal.3d at p. 223.) Like Berk, Hadid had ample means of informing himself of all the considerations relevant to his purchase of the property, but limited his inquiry to examining the title and making physical inspection of the property. Hadid stated that until this lawsuit, he had never heard of a public recreational easement, thus showing that he neglected to inform himself on the common law's possible effect on the property.

18

In *Gion*, *supra*, 2 Cal.3d 29, as in this case, "[t]he present fee owners of the lands in question have of course made it clear that they do not approve of the public use of the property. *Previous* owners, however, by ignoring the wide-spread public use of the land for more than five years have impliedly dedicated the property to the public. Nothing can be done by the present owners to take back that which was previously given away." (*Id.* at p. 44, italics added.) "Nothing" means the trial court could not move the Trail to suit Hadid, just as the trial court would be without power to move the Trail to make the route better for hikers. *Berk*, *supra*, 26 Cal.3d 201 makes clear that prospective purchasers must inform themselves not only of what appears on recorded instruments and in local codes but also of the possible effect of the common law.

Presiding Justice Rothschild's suggestion that public policy favors development of the land is irrelevant, and flies in the face of the entire history of implied dedication to the public. (Conc. opn. of Rothschild, P. J. *ante*, at p. 1.) I take exception to Presiding Justice Rothschild's contention that an alternative trail combined with home development would be a "win-win situation" for all parties. (Conc. opn. of Rothschild, P. J. *ante*, at p. 2.) Under her scenario, the public would still lose the extant historical Trail. The equities in this case do not balance equally. The interests of a few buyers of Hadid-constructed homes[4] and of Hadid himself are not equivalent to the public's interest in preserving the historical Trail for future use by generations to come.

As Presiding Justice Rothschild concedes, no evidence supported a relocation of the Trail. (Conc. opn. of Rothschild, P. J. *ante*, at p. 1.) Hadid did not allege a hardship defense, and offered no evidence at trial regarding the relocation of the Trail. Hadid did not testify that he could not develop his land if the Trail remained, and did not testify regarding any other hardship or relocation.

---

[4] Hadid testified that he had been a developer world-wide for 40 years, and after moving to Southern California in 1991 he had developed commercial buildings and mega-mansions (homes from 15,000 to 60,000 square feet).

19

Contrary to the majority's assertion on page 8 of the majority opinion, the defense expert in surveying and grading, Ken Shank, testified that he had never been asked by Hadid to reroute the Trail, and even if it were rerouted "there's really no practical place to put it if you're going to develop land over in this area." The only evidence at trial was that the Trail *could not* be relocated to minimize its effect on development. Hadid first raised the issue of relocation in his objections to the court's proposed statement of decision, attaching a declaration from Shank proposing an alternative easement (and contradicting Shank's trial testimony that no alternate route was practical). The trial court sustained Friends' objection to the declaration. After entry of judgment, Hadid's declaration attached to his motion for new trial stated that he had proposed an alternative easement to Friends during settlement discussions. The evidence of a settlement offer was inadmissible in the trial court under Evidence Code section 1152, subdivision (b). Just as the record contains no competent evidence regarding the status or provenance of the fire road, the record contains no competent evidence supporting relocation of the Trail. Moreover, Presiding Justice Rothschild's insistence that the trial court had the power to alter a trail whose public dedication vested more than 44 years ago reflects a troubling disregard for the permanence of public dedication once it has occurred. There are no do-overs 44 years later. Hadid no more had a leg to stand on when he belatedly requested equitable re-routing of the Trail than the trial court had the legal basis to contemplate such relief, once she had determined that implied dedication had vested by 1972.

The majority and the concurrences have done for Hadid what he and his lawyers could not do in the trial court, by minimizing and disregarding the detailed and credible testimony of civic-minded citizens who knew and enjoyed the Trail at least three decades before Hadid saw the land as ripe for development and profit, and by disregarding settled precedent and creating new law.

20

**CONCLUSION**

The late Senator and statesman from New York, Daniel Patrick Moynihan, frequently observed: "[Y]ou are entitled to your own opinion, but you are not entitled to your own facts." (Timothy J. Penny, *Facts Are Facts* (Sept. 4, 2003) National Review, at p. 1.) I would humbly add to that: And not your own law either.

This axiom, which applies equally to kitchen table discussions, academic and political discourse, and appellate review, is part of our societal fabric and underlies our faith in the judicial process.

I, therefore, must respectfully dissent. I would affirm the judgment and the order awarding attorney fees to Friends of the Hastain Trail and Mountains Recreation and Conservation Authority.


JOHNSON, J.

21